UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CHRISTOPHER STEWART,

        Petitioner,

        v.

ROBERT E. ERCOLE,

        Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM
AND ORDER
06 CV 1574 (JG)

A P P E A R A N C E S:

    CHRISTOPHER STEWART
        Reg. #02-A-3625
        Green Haven Correctional Facility
        P.O. Box 4000
        Stormville, NY 12582
        Petitioner *Pro Se*

    DANIEL M. DONOVAN, JR.
        Richmond County District Attorney
        130 Stuyvesant Place
        Staten Island, NY 10301
    By:    Anne E. Crick
        Assistant District Attorney
        Attorneys for Respondent

JOHN GLEESON, United States District Judge:

        Christopher Stewart petitions for a writ of habeas corpus, challenging his 2002 conviction in state court in Richmond County, following a jury trial, of murder in the second degree, aggravated criminal contempt, and criminal possession of a weapon in the third degree. For the reasons set forth below, the petition is denied.

BACKGROUND

A.     The Offense Conduct

Stewart's claims arise from his state prosecution for the March 8, 2001 killing of Angelique Williams, the mother of his daughter, Alexis. On February 20, 2001, Williams and Stewart had a confrontation at Williams's residence, leading to the issuance of an order of protection against Stewart. On the morning of March 8, 2001 Stewart appeared in Richmond County Criminal Court and was served with the order of protection on behalf of Williams.

That same evening, Williams boarded a Staten Island S-54 southbound bus at approximately 4:20 p.m. as a part of her daily commute home from work. Williams was headed towards the Todt Hill Houses on Schmidts Lane and Manor Road, where she once lived with her mother, and where she normally parked her car during the workday.

A MetroCard belonging to Stewart -- an employee of the Transit Authority -- shows that Stewart also boarded an S-54 bus on Staten Island between 4:18 and 4:24 p.m. that day, at a location that was a 7-9 minute bus ride from the Todt Hill Houses. At 5:25 p.m., Williams spoke with her friend Cherise Cohen on her cell phone to report that she was about to get off the express bus, and that she could pick up Cohen's daughter from school by 5:30 p.m.

Williams was murdered after the 5:25 p.m. call with Cohen but before 5:40 p.m., when a passing motorist called 911 after seeing Williams collapse outside the Todt Hill Houses. Williams was stabbed in her neck, abdomen, and right hand, including defensive cuts to each of her five right fingers that went to the bone; on some fingers the bone had been severed. The stab wound to the neck was 6-7 inches deep and severed Williams's right jugular vein, punctured and collapsed her right lung, and caused approximately one liter of blood to fill her right chest cavity.

Williams died as a result of her injuries. Three adolescent boys witnessed her collapse, as well as part of the stabbing itself.

Stewart came to the police on his own initiative on March 12, 2001. He told the police that he wanted to "clear his name," and that he got on a northbound S-46 bus in order to board the 5:40 p.m. Staten Island Ferry to Manhattan. He told officers that he then bought a ticket for a bus to Atlantic City that left at 8 p.m. on March 8, and that he stayed in Atlantic City for several days. The officers were later able to use MTA computer records to refute Stewart's statements about when he boarded the northbound bus in Staten Island. The records revealed that Stewart's MetroCard was used again between 5:42 and 5:48 p.m. that night on the S-54 bus as it traveled northward on its return trip.

A witness identified Stewart in a photo array on March 19, 2001, and officers arrested Stewart the following day.

B.  The Procedural History

1.  *The Testimony at Trial*

At trial, Nicole Spratley, Williams's longtime friend and roommate during the relevant events, testified that on February 20, 2001 she came home and found Williams and Stewart arguing. Williams was standing next to her car, and Stewart was sitting in the driver's seat. On the right side of Williams's face was a bruise that had not been there earlier that morning. When Spratley called 911, Stewart drove away in Williams's car. Spratley further testified that she walked into the house to find the door to Williams's bedroom torn off its hinges and the bedroom in shambles. She also saw Stewart drive past the house shortly after his initial departure, and testified that he sped away when the police arrived. Stewart later confessed that

he crashed Williams's car into a pole, causing Williams to rent a car that she drove until her death. Spratley testified that these events led to the order of protection that was issued on March 8, 2001.

Nolan Emory, age 12, James Costello, age 13, and Andre Cirino, age 14, were playing basketball in the park next to the Todt Hill Houses on March 8. The three testified that they heard a car alarm at approximately 5:30 p.m. Emory and Cirino went to investigate, saw an African-American man in a gray hooded sweatshirt with the hood up fighting with a woman they later identified to be Williams. Emory heard Williams say "I'm sorry," to which the man replied, "You're not sorry." Emory also saw the man's left hand moving repeatedly back and forth toward Williams's chest and stomach, while she continued to apologize. Cirino also saw the man's hand move towards Williams's chest one or two times, and heard her cry for help. Then the man bent down to pick up Williams's black bag, and walked away. The boys did not clearly see the man's face at that time.[1]

Costello joined the other two boys to see Williams bleeding, and also heard her say "I'm sorry." All three saw her stagger, slump against a car, and slide to the ground. Debra Alvarado, the 911 caller who was driving past the scene that evening, testified that she saw the three boys, and also saw Williams stagger, slump over a car, and fall to the ground.

Emory testified that in the minutes after the stabbing he went to a park inside the Todt Hill Houses known as "Little Park." In Little Park, Emory saw a man he recognized to be the same man who had just stabbed Williams. The man was wearing the same gray sweatshirt, and the front of the sweatshirt was covered in blood. Emory testified that the man was "freaking

---

[1] The parties stipulated at trial that on March 8, 2001 the sun set at 5:55 p.m.

out," and stopped and glared at him from approximately seven feet away. On March 27, 2001, Emory identified Stewart in a pretrial lineup as the as the man who he saw in Little Park on March 8, and also identified him at trial.

William Fuschino, who drove the S-54 bus on March 8, testified that he picked up a man that fit Stewart's description wearing a gray hooded sweatshirt at approximately 4:15 p.m., and that the man used an employee MetroCard. Fuschino testified that the man seemed cold or angry. Fuschino was also driving the northbound bus on its return trip as it passed the Todt Hill Houses that evening. Fuschino saw the police activity near the scene of the murder, but did not pay attention to the people getting on the bus at that stop.

Defense counsel sought to highlight certain inconsistencies in the testimony of the three boys, such as differing accounts of whether or not the boys scattered from the scene before the police arrived, the fact that Emory did not immediately report to the police that he had seen anyone in Little Park, and the fact that Emory, unlike the other two boys, did not report that the attacker was wearing a vest or a jacket over the gray sweatshirt.

2.  *The Jury Charge, Verdict and Sentence*

The trial court gave the jury an instruction on the lesser included offense of manslaughter in the first degree, as well as an identification charge and a Molineux charge. There was no mention at trial of a circumstantial evidence charge by defense counsel. In fact, defense counsel did not object to the charge except with respect to the lack of a missing witness instruction.

On May 31, 2002 the jury returned a verdict of guilty on all counts. Stewart was sentenced on June 14, 2002 to 25 years to life imprisonment for the murder count to run

concurrently with 2 to 7 year prison terms for the aggravated criminal contempt count and for the criminal possession of a weapon count.

Defense counsel submitted a post trial motion asserting legal insufficiency and weight-of-the-evidence arguments, and requested that the court dismiss the murder count, set aside the guilty verdict on that count, or modify the verdict from guilt of murder in the second degree to guilt of manslaughter. The court found that the evidence was legally sufficient and denied defense counsel's motion. Sentencing Transcript, 2-4.

3. *The Direct Appeal*

On appeal to the New York Supreme Court, Appellate Division, Stewart asserted trial error, arguing (1) the People failed to prove guilt beyond a reasonable doubt because the testimony of Emory was not a reliable basis for conviction, and the other evidence was circumstantial evidence that was inadequate to convict; (2) the trial court should have *sua sponte* issued a circumstantial evidence instruction to the jury.

On October 12, 2004, the Appellate Division affirmed the conviction, finding that the sufficiency of the evidence claim was not specific enough to have been preserved for appellate review. *People v. Stewart*, 782 N.Y.S.2d 799 (2d Dep't. 2004). The court also found that "in any event," the evidence was legally sufficient to convict. *Id.* The court further exercised its factual review power to find that the verdict was not against the weight of the evidence. *Id.* Finally, the court rejected Stewart's claim regarding the circumstantial evidence charge as unpreserved for appellate review, and, in any event, without merit. *Id.*

Stewart sought leave to appeal to the New York Court of Appeals by letter dated October 26, 2004. On December 28, 2004, the Court of Appeals denied leave to appeal. *People v. Stewart*, 790 N.Y.S.2d 661 (2004).

4. *The State Collateral Proceedings*

Stewart moved *pro se* to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10, arguing that his trial counsel was ineffective due to a failure to investigate a possible alibi defense. Stewart emphasized in his § 440 motion that Fuschino, the driver of the S-54 bus, testified that he drove northbound past the crime scene at 5:15 p.m. Stewart suggested that if he had boarded that bus at 5:42 p.m., he would have done so when the bus was already miles away from the scene of the crime, making it impossible for him to have been involved. Defense counsel did not formally file an alibi defense and did not call any alibi witnesses, but did raise the issue during his summation and on appeal.

The Supreme Court rejected Stewart's ineffectiveness claim on the merits, holding that "the defendant pleads no facts to support the conclusion that the alibi was viable, that defense counsel failed to investigate defendant's alibi information, or that an investigation would have led to a viable alibi." *People v. Stewart*, No. 85/01 (N.Y. Sup. Ct. July 21, 2006) (Rooney, J.) ("§ 440 Opinion"). The Appellate Division denied Stewart's application for leave to appeal the denial of his § 440 motion. *People v. Stewart*, No. 85/01 (N.Y. App. Div. 2d Dep't Sept. 8, 2006).

Finally, Stewart has filed a New York Freedom of Information Law ("FOIL") request with the New York City Police Department seeking any information pertaining to his case. The New York Supreme Court rejected the Police Department's motion to dismiss

Stewart's petition due to failure to exhaust, and ordered the Department to answer the petition. *Stewart v. Comm'r of the New York City Police Dep't*, No. 403452/05 (N.Y. Sup. Ct. Sept. 8, 2006) (Braun, J.). Stewart's FOIL request is now pending in state court.

Stewart maintains that the FOIL request will yield exculpatory material. Specifically, he claims that police possess (1) surveillance video taken at a Blockbuster video store in Staten Island on the night of the murder that would be exculpatory if it were to show that Stewart was inside the store while the murder took place; (2) a photograph taken at an EAB Bank cash machine in Manhattan at 8 p.m. on the night of the murder that would be exculpatory if it were to show Stewart wearing something other than a gray hooded sweatshirt.

By letter dated December 8, 2006, Stewart also refers to a motion for a writ of error coram nobis.

5.  *The Instant Petition*

Stewart submitted this petition dated March 28, 2006 pursuant to 28 U.S.C. § 2254, and claims that he was deprived of a fair trial because (1) the verdict went against the weight of the evidence since "the one eyewitness was a child and his testimony contradicted the evidence at trial"[2]; (2) the judge failed to give a circumstantial evidence charge; and (3) trial counsel was ineffective.[3]

---

[2] Because Stewart has filed his petition *pro se*, his submissions must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). I therefore deem the petition to include a legal sufficiency claim in addition to the weight-of-the-evidence claim that Stewart has articulated. The respondent has addressed this inferred legal sufficiency claim in its opposition papers, and Stewart included argument related to legal sufficiency in his response to the opposition.

[3] Upon Stewart's request for leave to amend his petition to include the ineffectiveness claim from his § 440 petition, I deemed Stewart's ineffectiveness claim to be a part of the petition without requiring formal amendment.

6. *The Stay and Abeyance Request*

Stewart seeks a stay and abeyance of his petition to allow him to exhaust his FOIL request in state court so that he may add a *Brady* claim to the instant petition.[4] At a hearing held on December 22, 2006, I directed the respondent to provide an affidavit relevant to whether police officers investigating the murder located the Blockbuster surveillance tape or cash machine photograph, and to report any relevant information contained therein.

DISCUSSION

A. Habeas Corpus Relief

§ 2254 provides for federal review of state court convictions "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (2004).

1. *The Exhaustion Requirement*

A federal court should not grant a writ of habeas corpus unless the petitioner has exhausted state court remedies. *See* § 2254(b)(1)(A). To meet this exhaustion requirement, a petitioner must have presented the state courts with "the same claim he urges upon the federal courts," *Picard v. Connor*, 404 U.S. 270, 276 (1971), as a way of giving the state court "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Id*. at 275 (internal citations omitted). In order to have "fairly presented" federal claims to the state courts, a petitioner must have (1) "set forth in state court all of the essential factual allegations asserted

---

[4] Stewart also seeks a stay and abeyance in order to exhaust a coram nobis petition. I assume for the purposes of this petition that any relevant coram nobis petition argues that appellate counsel was ineffective due to a failure to develop an alibi defense and/or a failure to investigate the existence of the Blockbuster store's surveillance tape. Therefore, my discussion of the § 440 petition and the FOIL request shall also serve as a discussion of the coram nobis petition.

9

in his federal petition," and (2) "placed before the state court essentially the same legal doctrine he asserts in his federal petition." *Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 191-92 (2d Cir. 1982) (en banc). In essence, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id*. at 192.

State courts may be alerted to the constitutional nature of a claim if the defendant cites the constitution, relies upon relevant federal or state precedent that includes pertinent constitutional analysis, presents a right specifically protected by the constitution (such as the right to "effective assistance of counsel"), or alleges a pattern of facts that is commonly thought to lie within the "mainstream of constitutional litigation." *See Daye*, 696 F.2d at 192-94. A petitioner has also "fairly presented" federal claim to state court if the legal standards for a federal and state claim are so similar that "by presenting his state claim, he also presented his federal claim." *Jackson v. Edwards*, 404 F.3d 612 (2d Cir. 2005).

"An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Therefore, when a petitioner fails to exhaust one or more claims, a federal district court may deny the unexhausted claims on their merits rather than dismiss the petition in its entirety. *See Pratt v. Greiner*, 306 F.3d 1190, 1197 (2d Cir. 2002).

2.   *Procedural Default*

Even if a petitioner has exhausted his or her federal claims in state court, the claims may still fail if the state court has explicitly and actually relied upon a procedural bar as a basis upon which to deny the claim. *See Harris v. Reed*, 489 U.S. 255, 261-63 (1989); *Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir. 2001). Where there has been actual reliance upon

10

procedural default to dispose of the claim, there is an "adequate and independent state ground" for the judgment, prohibiting federal habeas review. *See Harris*, 489 U.S. at 261; *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d. Cir.1995). *See also Coleman v. Thompson*, 501 U.S. 722, 744, 750 (1991) (noting the state's interest in "channeling the resolution of claims to the most appropriate forum, in finality, and in having the opportunity to correct [their] own errors"); *Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002) (noting the existence of a "small category" of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question").

A state court holding that a claim is unpreserved for appellate review *and* without merit creates actual reliance upon procedural default in rejecting the claim. *See Harris*, 489 U.S. at 264 n.10; *Fama*, 235 F.3d at 810 n.4 ("[W]here a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits," the claim is not preserved for federal habeas review.").

In the event that a state appellate court rejects a claim as procedurally defaulted, the claim may only be considered on federal habeas review upon a showing of cause and prejudice, or upon a showing that a miscarriage of justice will result if the claim is not reviewed. *See Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989). A petitioner may establish cause by showing "'that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable.'" *Coleman*, 501 U.S. at 753 (ellipses in original) (internal quotation marks omitted) (quoting *Murray v. Carrier*, 477 U.S. 478, 492 (1986)). To satisfy the prejudice requirement, the alleged error must have worked to the petitioner's "actual and substantial

11

disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted). If the petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). This fundamental miscarriage of justice exception to the procedural default rule is "extremely rare," and should be applied only in "extraordinary circumstances." *See Sweet v. Bennett*, 353 F.3d 135, 142 (2d Cir. 2003) (citing *Schlup*, 513 U.S. at 321-22).

3. *AEDPA Deference to State Court Factfinding and Decisions*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. *See* 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only where the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," or where the petitioner presents clear and convincing evidence to rebut the presumption that state court findings of fact are correct. *See* 28 U.S.C. § 2254(d)(2); § 2254(e)(1). Habeas relief is also warranted if the state court's adjudication of the federal claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court decision is an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme

Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Furthermore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist*, 260 F.3d at 93 (citing *Williams*, 529 U.S. at 411); *see also Yarborough v. Gentry*, 124 S. Ct. 1, 4 (2003) (per curiam) ("Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable.").

This deferential standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether it has alluded to federal law in its decision. As the Second Circuit stated in *Sellan v. Kuhlman*:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim -- even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

261 F.3d 303, 312 (2d Cir. 2001).

B. Stewart's Claims

1. *The Stay and Abeyance Request*

The respondent has provided an affidavit from Heidi Tannenbaum-Newman, the prosecuting attorney in Stewart's trial. The affidavit states that detectives interviewed employees of a Blockbuster video store near the scene of the crime, and that they reported seeing a black male standing at the window looking out on Manor Road prior to the murder. However, the

13

affidavit also reports that the store's security cameras "either did not have the ability to record or had a continuous feed tape that taped over any recording of a male at [the] store," and that "there was no tape for the detectives to view or seize as evidence." Tannenbaum-Newman Affidavit, ¶ 2. The affidavit further states that cash machine photographs taken at an EAB Bank in Manhattan later that evening were made available to the defense prior to trial. *Id.* at ¶ 3.

The respondent has established to my satisfaction that there is no existing Blockbuster store videotape that might depict Stewart in the store at the time of the murder. Moreover, Stewart's claim that such a recording would place him in the immediate vicinity of the murder at the time of the murder directly contradicts his claim that he boarded a northbound bus at 5:42 p.m., when the bus was already miles away from the scene of the crime. Indeed, if such a video depicting Stewart were to exist, it would likely be more inculpatory than exculpatory. As the respondent has pointed out, the store at Manor Road "would have provided an ideal place for the murderer to wait, out of the cold, watching for Angelique Williams to get off the express bus at the corner of Manor Road and Schmidts Lane." Affidavit in Opposition to Stay, ¶ 7. Furthermore, the fact that Stewart may have been wearing clothes other than a gray sweatshirt in the EAB photographs is not relevant to what he was wearing several earlier, when the murder was committed.

Therefore, I do not find it appropriate to stay these habeas proceedings on those grounds, and I deny Stewart's request that I do so.

2. *The Weight-of-the-Evidence and Legal Sufficiency Claims*

Stewart argues that Emory's testimony linking him to the crime was unreliable and contradicted by other evidence, making the verdict against the weight of the evidence. For

similar reasons, he argues that the evidence at trial was legally insufficient to sustain a guilty verdict.

Stewart first asserts that the inference linking the man Emory identified in Little Park to the man that Emory saw stabbing Williams was weak, because it was based upon the fact that both men wore a "commonplace" gray sweatshirt, and because the man wore a hood that limited Emory's view of important features, such as his hair and parts of his cheeks. Stewart argues further that Emory's eyewitness identification was unreliable according to the five factors set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) ("[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."). He notes that Emory had an opportunity to view the man in Little Park for a short time, perhaps only a few seconds, and did not detail the color and size of the blood stains on the front of the man's sweatshirt, or explain how he knew that the stains were blood. Finally, Stewart suggests that Emory's testimony is unreliable because it would have been impossible for someone to have committed the crime just before the 5:40 p.m. 911 call, gone to Little Park, and then boarded a bus between 5:42 and 5:48 p.m., as MetroCard records show.

  i.  *The Sufficiency Claim*

Though New York law grants New York appellate courts the right to evaluate the weight of the evidence, *see* N.Y. Crim. Proc. Law § 470.15 (1970), and to order new trials on that ground, federal courts on habeas review may properly assess only the sufficiency of the

15

evidence. Specifically, they may determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Garbez v. Greiner*, 2002 WL 1760960, at *8 (S.D.N.Y. 2002) ("A federal habeas court cannot address weight of the evidence claims because a challenge to a verdict based on the weight of the evidence is different from one based on the sufficiency of the evidence. Specifically, the weight of the evidence argument is a pure state law claim . . . whereas a legal sufficiency claim is based on federal due process principles.") (internal citations omitted). A sufficiency claim necessitates a legal inquiry, though it remains "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

The Appellate Division's conclusion that the sufficiency claim was not specific enough to have been preserved for appellate review, *Stewart*, 782 N.Y.S.2d at 799, poses a procedural bar to my review of the claim, and Stewart has not demonstrated the cause and prejudice necessary to overcome this bar, nor has he shown that a miscarriage of justice would result if the claim is not reviewed. In any event, the claim has no merit. The identification testimony by Emory, together with the ample circumstantial evidence placing Steward near the scene and his obvious motive, all viewed in the light most favorable to the government, amply support the convictions. The Appellate Division's ruling that the evidence was legally sufficient does not present an unreasonable application of federal law.

2.  *The Circumstantial Evidence Charge*

Stewart argues that the evidence in the case was entirely circumstantial, so the trial court erred in failing to give, *sua sponte*, a circumstantial evidence charge to the jury. Stewart asserts that this failure was prejudicial to him and that it violated his due process rights.

Under New York law, a circumstantial evidence jury charge is required only when the evidence against a defendant consists solely of circumstantial evidence, and when the defendant requests the instruction. *See People v. Daddona*, 599 N.Y.S.2d 530 (1993) ("Whenever a case relies wholly on circumstantial evidence to establish all elements of the charge, the jury should be instructed, in substance, that the evidence must establish guilt to a moral certainty. However, where a charge is supported with both circumstantial and direct evidence, the court need not so charge the jury.") (internal citations omitted). Even if a court's failure to give a circumstantial evidence charge is error, a habeas petitioner may prevail only where the omission "so infected the entire trial that the resulting conviction violates due process." *Blazic v. Henderson*, 900 F.2d 534, 543 (2d Cir.1990) (internal quotations omitted).

The Appellate Division's rejection of this claim as unpreserved bars me from reviewing it on the merits. Its additional holding that the claim is without merit limits any substantive habeas review to the question whether the state court applied clearly established federal law in an unreasonable way.

The Appellate Division's rejection of the circumstantial evidence charge was consistent with federal law. Emory's eyewitness identification of Stewart was direct evidence that supplemented the circumstantial evidence in the case, perhaps accounting for defense counsel's decision not to request the instruction. Moreover, the trial court's other instructions to

17

the jury served substantially the same purpose as a circumstantial evidence charge. For example, the court's charge included an instruction that the jury could not convict unless it found "proof that leaves you so firmly convinced of the defendant's guilt that you have no reasonable doubt of the existence of any element of the crime or of the defendant's identity as the person who committed the crime." Trial Transcript, 645. The court also instructed the jury to consider the identification evidence carefully, and that when evaluating the "believability of the witness who made an identification" it should consider factors such as the witness' opportunity to observe and ability to recall relevant details. *Id.* at 652-53.

Even if Stewart could overcome the procedural bar, therefore, I could not find that the state court's ruling on the claim was an unreasonable application of clearly established federal law such that habeas relief would be permitted.

3.  *The Ineffective Assistance of Trial Counsel Claim*

Stewart bases his ineffective assistance of trial counsel claim on the fact that his lawyer did not investigate or present an alibi defense related to Fuschino's testimony that he had driven past the busy crime scene at approximately 5:15 p.m. If that testimony were correct, it would have placed Stewart a significant distance away from the scene when he boarded the bus between 5:42 and 5:48, the time MetroCard records establish he boarded the bus.

According to the Supreme Court, counsel is ineffective pursuant to the Sixth Amendment when he or she has been deficient, *i.e.*, when he or she has made errors so serious that the Sixth Amendment guarantee to "counsel" has not been fulfilled, and that deficiency prejudices the defendant. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984) ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). A reviewing court should note that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* at 691.

Stewart's trial attorney did not serve an alibi notice, nor did he introduce an alibi witness. However, he cross-examined Fuschino, highlighting his testimony about the time he passed the crime scene driving northbound, and he continued to highlight that testimony in summation and on appeal. That attention to the issue hardly constituted deficient performance. Moreover, the decision to forego a formal alibi defense is entirely consistent with a fear that the defense might have harmed the defendant's case. Fuschino's recollection of the time he passed the crime scene cannot be reconciled with the fact that a crime scene was not established by the police until after the 5:40 p.m. 911 call by the passing motorist. In other words, Fuschino's testimony appeared to be incorrect as to the precise time of the events he described. Therefore, defense counsel's failure to pursue the alibi defense was presumably a strategic choice, and a reasonable one at that.

In sum, the state court's rejection of Stewart's claim of ineffectiveness of trial counsel was not an unreasonable application of clearly established federal law. To the contrary, for the reasons outlined above, I agree with the state court's rejection of the claim.

CONCLUSION

For the foregoing reasons, the petition is denied. As Stewart has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.

So ordered.


John Gleeson, U.S.D.J.



Dated: February 15, 2006
      Brooklyn, New York